UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———

| | | |
|---|---|---|
| RANDALL MODD, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:10-cv-337 |
| | ) | |
| v. | ) | Honorable Robert Holmes Bell |
| | ) | |
| COUNTY OF OTTAWA, et al., | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendants. | ) | |
| | ) | |

On the evening of Wednesday, October 31, 2007, Randall Modd was transported from the Muskegon County Jail to the Ottawa County Jail on a probation violation warrant. The medication prescribed by his private physician to treat bipolar disorder did not follow him. He did not get replacement medications until Tuesday, November 6, 2007. By that time, his psychiatric condition had so deteriorated that he required hospitalization from November 7 to 15, 2007.

Two and a half years later, Mr. Modd, through counsel, filed this lawsuit under 42 U.S.C. § 1983. Plaintiff's original complaint named Ottawa County, Ottawa County Sheriff Gary Rosema, SecureCare, Inc. (a private corporation that provides medical care to county prisoners pursuant to contract), three individuals, and five "John Does." In response to a Rule 12(b)(6) motion, the court dismissed all claims against Lt. Steven Barr and against Sheriff Rosema in his individual capacity. (Op. & Order, docket #s 32, 33). After subsequent voluntary dismissal of defendants, the remaining defendants are Ottawa County, Sheriff Rosema in his official capacity, SecureCare, and Karen Garvey, a medical assistant formerly employed by SecureCare. Plaintiff alleges that Garvey was deliberately indifferent to plaintiff's need for prescription medication to treat

bipolar disorder and diabetes.  He alleges that the County and SecureCare had a "policy, pattern or practice of withholding or denying prescription medications" or that they failed to train jail staff in the proper provision of prescription medication.  (Am. Compl. ¶ 67).

Discovery has now closed, and defendants have moved for summary judgment. District Judge Robert Holmes Bell has referred this matter to me for the entry of a report and recommendation on dispositive motions, pursuant to 28 U.S.C. § 636(b)(1)(B).  I conducted oral argument on the dispositive motions on May 16, 2012.  After review of the record, I conclude that plaintiff has failed to establish a jury-submissible federal claim against any defendant.

## Proposed Findings of Fact

### A.    Medical Care at the Ottawa County Jail

The Ottawa County Jail is the tenth largest jail facility in the State of Michigan, holding approximately 350 inmates at any one time.  During the year 2007, the jail processed approximately 8,500 inmates.  (Baar Aff. docket # 132-6).  Pursuant to Michigan statute, the jail is under the supervision of the county sheriff, who was defendant Gary A. Rosema during all times relevant to this case.

To provide medical care for the inmates at the Ottawa County Jail, the county entered into a contract with defendant SecureCare, Inc. dated January 1, 2005.  (Plf. Ex. 13, docket # 155-8). The contract had a three-year duration and therefore was in effect in October and November of 2007, when plaintiff was lodged at the jail.  The contract (¶  3) incorporated by reference Exhibit A (a request for proposal that had been issued by the county in October 2002) (Plf. Ex. 40, docket # 159-

2) and Exhibit B (the SecureCare proposal made in response thereto) (Plf. Ex. 41, docket # 159-3). Relevant to the present case, these documents contain the following provisions:

- Within 24 hours of an inmate's arrival, SecureCare personnel must perform a "preliminary health screening."  The preliminary health screening, among other subjects, covers inquiry into current illnesses, health problems, and conditions, including "mental, dental and communicable diseases" and "medications taken." (Contract, Ex. A, ¶ 3.1(A), ID# 1469).  The contract provided that an inmate would be referred for treatment if the preliminary health screening disclosed a need for immediate medical attention.  (*Id.*, ID# 1470).

- With regard to the administration of medication, the contract required SecureCare to verify all medications "with outside physicians or agencies for those inmates who are booked into the facility with active prescriptions."  SecureCare was also required to monitor distribution of medications to the inmate population, "including psychotropic medications."  (*Id.*, ¶ 3.1(B), ID# 1471).

- The contract required SecureCare to provide for an on-site physician for ten to twelve hours per week "to perform all basic primary care activities."  The contract required daily review of inmate medical complaints, with referrals to appropriate medical personnel as deemed necessary.  When medically possible, the on-site physician would handle the request, with more difficult cases to be referred appropriately.  (*Id.*, ¶ 3.1(D), ID# 1472).

- SecureCare's proposal included an optional provision covering psychiatric care.  The proposal offered to provide an on-site psychiatrist for 11 hours per week to evaluate,

-3-

treat and prescribe medications for inmates needing mental health care. Each inmate would be evaluated within fourteen days of admission. (Contract, Ex. B, docket # 159-3, ¶ 3.5). Ottawa County declined this extra medical coverage.

As noted, the County opted against having a SecureCare psychiatrist serve at the jail. The contract, however, required SecureCare personnel to administer all medications, including psychotropic medications. (*Id.* at ¶ 3.1(B)). Beyond that, the County had an ongoing arrangement with Ottawa County Community Mental Health (CMH).[1] CMH assigned a permanent "jail liaison" to the Ottawa County Jail, to assess inmates for mental illness and to make recommendations. (Jachalke Dep., docket # 156-5, at 5-6, ID#s 1352-53). At all times relevant to this case, the jail liaison was Matt Jachalke, a mental health worker with an MSW. (*Id.* at 5). Jachalke spent two hours at the jail every morning; in addition, jail personnel could ask for crisis intervention 24 hours a day. (*Id.* at 6-7). In cases where inmates come to the jail with a prescription for psychotropic medications, Jachalke had no formal role in procuring medications, but would sometimes facilitate in this regard by contacting family or outside agencies. (*Id.* at 8, 10). He would at times follow up to assure that inmates in fact were on their medications. (*Id.* at 10). A psychiatrist provided by CMH visited the jail once a month. (*Id.* at 12). If emergencies arose in the meantime, Jachalke often arranged for appointments at the CMH offices or with private psychiatrists, and jail staff would provide transport. (*Id.* at 12-13). Finally, any corrections officer can decide to send an inmate to a mental hospital. (Barr Dep. at 115-16, ID# 764).

---

[1] Community Mental Health agencies were created by the Michigan Mental Health Code. *See* MICH. COMP. LAWS §§ 330.1200a-.1245. Acting under the auspices of the Michigan Department of Community Health, local CMHs provide mental health and substance abuse services to low-income persons within their assigned localities.

After being awarded the contract to provide health care services at the Ottawa County Jail, SecureCare implemented an "Ottawa County Adult Correctional Facility Correctional Health Care Policy and Procedural Manual." (Plf. Ex. 43, docket # 159-5). The procedural manual ("Manual") covered a multitude of topics. With regard to ultimate responsibility for health care decisions, the Manual provided that decisions and actions regarding health care services for inmates "shall be the sole responsibility of health care personnel and shall not be compromised for security reasons." (*Id.* at ¶ 3.3, ID# 1494). Addressing the initial medical screening of inmates, the Manual provided that a trained booking officer must complete a medical screening, to be reviewed by medical personnel within 24 hours of booking. (*Id.* at ¶ 30, ID# 1529). Additionally, "inmates transferred to the Ottawa County Adult Correctional Facility from other institutions will have a complete initial screening performed." (*Id.* at ¶ 30.5). The screening process is to include inquiry into current illnesses and health problems, including "medications taken." (*Id.*). The policy manual further provided for a full health assessment by a physician or nurse within fourteen days of an inmate's arrival. (*Id.* at ¶ 31.1). If the initial screening showed that an inmate required mental health services, health care personnel were to refer the inmate to CMH for further evaluation. (*Id.* at ¶ 32, ID# 1532). CMH, however, serves only persons on Medicaid or without insurance. (Jachalke Dep., docket # 156-5 at 41).

With regard to administration of medications, the Manual required that prescription medications be administered or delivered upon the order of a physician or other legally authorized individual. The on-site SecureCare physician would determine prescriptive practices for treating patients' medical conditions at the jail, while CMH psychiatrists would determine prescriptive practices for treating psychiatric conditions. (docket # 159-5 at ¶ 25, ID# 1522).

At the times relevant to this case, SecureCare employed Dr. Ruperto Blanco as the on-site jail physician; two other doctors were also on-call. (Garvey Dep. at 11, docket # 155-9, ID# 1264). The medical team included a clinical administrator (Wendy Benson, RN) and administrative assistance (Nancy Windemuller), two staff registered nurses (Roxanne Brook and Megan Vink), two LPNs (Janet Lance and Robyn Zeedyk), and an unlicensed medical assistant, defendant Nancy Garvey.

### B.    Randall Modd

At the time in question, plaintiff Randall Modd was 51 years of age. He was on permanent disability status as a result of bipolar disorder, after serving for 17 years as an officer of the Michigan Department of Corrections. He was last employed in that capacity in the year 2003. (Modd Dep. at 6-8, docket # 154-3, ID#s 1151-52). He was first diagnosed with bipolar disorder at the age of 26, at which time he was admitted involuntarily to the Kalamazoo Psychiatric Hospital. (*Id.* at 8-9). Mr. Modd had been diagnosed with diabetes in 1995 or 1996. (*Id.* at 21). Before the time in question, plaintiff had been hospitalized four times as a result of his bipolar condition, including the initial hospitalization at Kalamazoo Psychiatric Hospital. The last hospitalization had been in the year 2003. (*Id.* at 85).

Mr. Modd had been incarcerated in the past at the Ottawa County Jail, most recently from October through December of 2006. During that 60-day period of incarceration, he faithfully took his medicine for both diabetes and bipolar disease. Plaintiff testified that during his incarceration in 2006, no one at the jail deprived him of these medications. Plaintiff was next

incarcerated in the summer of 2007, and had no problem in obtaining his medications.  (Modd Dep. at 27-29).

It is beyond genuine issue that plaintiff's mental condition had deteriorated immediately before his arrival at the Ottawa County Jail on October 31, 2007.  Plaintiff testified that starting in September or October, 2007 was not a "good year."  (Modd Dep. at 92).  Plaintiff was having trouble with both his wife and his probation officer at the time and was going through a "medication change."  (*Id.* at 93-95).  On October 24, 2007, his decompensation caused plaintiff's wife to petition for involuntary commitment.  The police took plaintiff to Hackley Hospital in connection with the petition for involuntary commitment.  Doctors at Hackley discharged plaintiff after about two hours.  (*Id.* at 98-102).  In response, plaintiff tried to get a personal protection order entered in circuit court against his wife.  (*Id.* at 96-97).  Plaintiff and his wife continued to argue about a number of subjects, including plaintiff's medications, which his wife wanted increased.  (*Id.* at 99).

On the next day, plaintiff had a regularly scheduled visit with his psychiatrist, Dr. Nan Alt.  He reported that he was not doing well.  He related his conflicts with his wife and his brief hospitalization at Hackley the previous day.  Dr. Alt continued to adjust his medicine, keeping the lithium dosage at the same level (Alt had reduced it earlier in the year) but increasing the dosage of Buspar and ordering a one-week trial of Zyprexa.  (Plf. Ex. 4, Rpt. 10/25/2007, docket # 154-5, ID# 1210).

After plaintiff's discharge from Hackley Hospital, he and his wife had another argument over money.  His wife called the Fruitport Township police, who arrested plaintiff for assault and battery.  He was lodged in the Muskegon County Jail on October 30, 2007.  (Plf. Ex. 7,

-7-

docket # 155-2, ID# 1224).  The arresting officers took plaintiff's psychotropic medications to the jail, (Modd Dep. at 106-07, ID# 1176), but he was then out of his diabetes medication.  (*Id.* at 133-34).  Jail personnel administered plaintiff's psychotropic medications to him on the morning of October 31, 2007.  (*Id.* at 108).  Plaintiff posted bond and was released from the Muskegon County Jail.  (*Id.* at 105).  He was then transferred to the Ottawa County Jail, because a detainer (Plf. Ex. 9, docket # 155-4) had been placed on him by his probation officer as a result of the new charges in Muskegon County.  (*Id.* at 110).

### C.    Plaintiff's Treatment at the Ottawa County Jail

#### 1.    Transportation and Booking

It is undisputed that the transportation officer from Ottawa County did not take plaintiff's psychotropic medications when he picked him up from the Muskegon County Jail. Plaintiff raised the issue during the ride, and Deputy VandenBosch said that they would "take care of it" when they reached Ottawa County.  (Modd Dep. at 116).  Upon arrival at the Ottawa County Jail, VandenBosch informed the booking officer of the existence of medications back at the Muskegon County Jail.  (*Id.*).

According to Deputy VandenBosch's time records (Plf. Ex. 10, docket # 155-5, ID# 1233), he arrived at the Ottawa County Jail with plaintiff at 6:54 p.m.  At 8:05 p.m., plaintiff was interviewed by the booking officer.  His "Medical Screening" record (docket # 132-1, ID# 765) reflects that plaintiff was bipolar and was taking three prescription medications ("Lithium/Buspar/Zantex") and was under the care of Dr. Alt.  The record also identified plaintiff as diabetic.  The booking officer recommended "health service or emergency treatment."  (*Id.*).

-8-

2.      Preliminary Health Screening

Two hours later (10:00 p.m.), Mr. Modd received his preliminary health screening by defendant Karen Garvey.  (Garvey Dep. at 41-42, docket # 155-9, ID#s 1271-72).  Garvey had earned a certificate as a medical assistant, but such positions are not licensed by the State.  (*Id.* 7-8, 49-56).  She was hired by SecureCare to work the 2:30 p.m. to 11:00 p.m. shift Monday through Friday.  (*Id.* at 8-9).  Her duties included screening inmates, verifying and ordering medications, and answering inmate "kites."  (*Id.* at 13).  She performed initial screening throughout the day.  (*Id.* at 14).  If an inmate showed signs of needing mental health treatment, she would put him on the list to see the CMH worker the next day.  (*Id.* at 18).

Garvey documented the preliminary health screening in four medical records.  (Plf. Ex. 11, docket # 155-6, ID#s 1235-38).  The first is headed "Ottawa County Screening Document." On this form, Garvey listed as plaintiff's "present meds" Buspar, Lamictal, Depakote, Januvia (a diabetes medication), and lithium carbonate.  She noted that the medications were "in Muskegon Co. Jail."  The record noted Dr. Alt as plaintiff's physician and stated that he was being treated for bipolar disorder and diabetes.  (*Id.* at ID# 1235).  On the "Problem List" record, Garvey noted "Bipolar" and "NIDDM" (non-insulin dependent diabetes mellitus).  (*Id.* at ID# 1326).  She completed a Diabetes Special Needs Treatment Plan (*Id.* at ID# 1237), noting the medication Januvia.  Garvey's Progress Notes (*Id.* at ID# 1238) also reflected a history of diabetes and bipolar disorder.  On this subject, she directed that plaintiff was to have his blood sugar checked in the morning for three days, then as needed.  She also directed a "diabetic diet."  Concerning plaintiff's medications, Garvey noted:  "States meds were at Muskegon Co. Jail.  Should have been brought down with him.  Will try to verify and get meds from Muskegon Co. Jail."  (*Id.*).

-9-

Garvey sent an e-mail to the corrections staff at 10:13 p.m., directing that plaintiff be allowed to check his blood sugar before breakfast for the next three days, and then as needed thereafter.  (docket # 134, ID# 862).  She also wrote an note to the kitchen (*Id.* at ID# 863) directing a "Diabetic Diet.  No p.m. snack."  A jail medical record shows that plaintiff's blood sugar was tested at 6:15 a.m. the next day (November 1) and at least once a day thereafter.  (docket # 134-3, ID# 950).

Garvey's shift ended at 11:00 p.m., less than an hour after she completed the preliminary health screen.  It is undisputed that she did nothing that night to retrieve the medications. Because of time constraints, she left that task for the morning shift.  (Garvey Dep. at 63).  The Clinical Administrator for SecureCare, Nurse Wendy Benson, confirmed that if the initial screener could not verify medications because it was late in the shift, this task could be left to the next shift. (Benson Dep. at 40, docket # 156-1).  Garvey testified that she completed plaintiff's chart and placed it on the "designated spot" on a back counter, where the charts needing attention by the next shift were placed.  (Garvey Dep. at 58-59).  She does not recall making any other notes or instructions for the day shift.  SecureCare had in place a "follow-up" list procedure pursuant to which all items requiring attention from the next shift should be listed.  (Nurse Vink Dep. at 23-24, docket # 156-3, ID# 1332).  The logs for October 31 and November 1, 2007, do not contain any notation regarding plaintiff, although other inmates are mentioned.  (Plf. Ex. 54, docket # 180-3).  These forms do corroborate Garvey's testimony concerning the practice of placing items needing attention on the back counter:  the first entry the November 1 morning shift is "back counter reviewed."  (*Id.* at ID# 1868; *see also* Vink Dep. at 23, ID# 1332 (follow-up items placed on back counter)).

-10-

3.      Screening by CMH (Matt Jachalke)

When Garvey learned that Mr. Modd was taking psychiatric medications, she put him on the list to be seen by the CMH mental health worker, Matt Jachalke, following "standard practice." (Garvey Dep. at 18, 48, docket # 155-9, ID#s 1266, 1273). Jachalke was employed as a mental health clinician by Ottawa CMH, and his duties included performing assessments of inmates at the jail. (Jachalke Dep. at 5-6; docket # 156-5, ID#s 1352-53).

Jachalke performed a mental health assessment on Randall Modd at 10 a.m. on November 1, 2007, plaintiff's first full day at the jail. Jachalke completed a Crisis Assessment form (docket # 157-3) chronicling the interview. The form noted that plaintiff was taking Depakote, lithium and Seroquel, prescribed by Dr. Alt. (*Id.* at ID# 1374). Jachalke quoted plaintiff as saying that his "medications are changed and that he needs to be admitted inpatient." (*Id.*). He wrote that Mr. Modd "blames all symptoms on medication changes and takes no personal responsibility." (*Id.* at ID# 1375). Jachalke described plaintiff as "angry," "defensive," and "homicidal." (*Id.* at ID#s 1375-76). He recommended "low risk suicidal precautions" and "appropriate measures to prevent harm to others." (*Id.* at ID# 1377).

Jachalke's report indicated, "I will coordinate medication information with Dr. Alt." (*Id.* at ID# 1377). Jachalke testified that coordinating psychotropic medications was not a defined part of his role, but that he would sometimes assist in securing prescription medications or coordinate with medical staff. (Jachalke Dep. at 8, 10, docket # 156-5, ID#s 1353-54). In this case, Jachalke decided to coordinate with Dr. Alt. "Because medications need to be verified as correct before being given in the jail setting, I offered to assist the medical staff to try to make that happen." (*Id.* at 25). He testified that he did speak to someone on the medical staff about it and that either he

-11-

or a member of the medical staff attempted to communicate with Dr. Alt (or Catholic Social Services) on November 1. (*Id.* at 32, 34, 45).

        4.    <u>Verification of Psychiatric Medications</u>

The verification process for psychiatric medication entailed contacting the prescribing doctor. (Nurse Benson Dep. at 43, docket # 156-1, ID# 1308). Under SecureCare's "med verification" procedures, all attempts to verify prescriptions, including unsuccessful calls, should be recorded in the Progress Notes. (*See* Nurse Vink Dep. at 20-22, docket # 156-3; Benson Dep. at 49-50). The Progress Notes for plaintiff (docket # 155-6), however, reflect no such efforts. Nevertheless, it is clear that either Jachalke or the SecureCare staff did contact Dr. Alt on November 1, because on that day, Dr. Alt faxed a prescription to the jail for Zyprexa and lithium. (Plf. Ex. 24, docket # 157-4). The receipt of the prescription is nowhere reflected in the SecureCare medical records.

Once the medications were verified by the prescribing doctor, it was the obligation of the SecureCare medical staff to dispense the medications to the inmate. (Benson Dep. at 46-47). Although SecureCare personnel had a prescription for plaintiff's psychiatric medications at approximately 12:40 p.m. on Thursday, November 1, no immediate action was taken to fill the prescription. Defendants argue that the delay was attributable to concern by Jachalke or the medical staff about restarting the medication after a two-day hiatus. They assert that filling of the prescription was therefore delayed while staff attempted to contact Dr. Alt, without success, to ascertain whether the medications should be "tapered." Very little evidence supports this contention. The Progress Notes for plaintiff do not record any efforts to contact Dr. Alt during this period. No

one has testified unequivocally that the delay in filling the prescription was caused by a concern for "tapering." Defendants rely on the deposition of Matt Jachalke for this proposition, but Jachalke did not attribute the delay to the "tapering" concern. Jachalke was aware of the delay, but he did not ascribe the delay in delivering medications to any particular cause. (Jachalke Dep. at 30-32). Jachalke testified that he was aware of efforts to contact Dr. Alt concerning tapering, but he never indicated when these efforts took place. (Jachalke Dep. at 46-47).

   An undated Post-It attached to the prescription does mention tapering. (Plf. Ex. 24, docket # 157-4). No one has testified that the note reflects the medical staff's concern between November 1 (when the prescription was received) and November 5 (when the medical staff finally got the medications). The author of most of the note, Nurse Zeedyk, was not even willing to say that the note referred to Randall Modd at all, and her best guess was that it was written on November 7. (Zeedyk Dep. at 14-16, docket # 156-2). On the present record, therefore, a trier of fact could easily conclude that the efforts to reach Dr. Alt to discuss "tapering" did not delay filling the prescription, but occurred after Monday, November 5, when the prescription was finally filled.

   The record, construed in a light most favorable to plaintiff, indicates that SecureCare personnel did nothing to fill Dr. Alt's prescription between November 1 and Monday, November 5. The reason for this delay remains a mystery on this record. The progress notes and other medical records say nothing about the receipt of the prescription on November 1, and they are likewise silent about the reasons for delay in filling it. No witness has testified to the cause of the delay. At this point, apparently no one remembers.

5.     Filling the Prescription

Plaintiff wrote two kites (Plf. Exs. 21, 26, docket #s 157-1, 157-6) on November 1

complaining that he was "out of meds," but they were not answered until the next week.  His wife

also called the jail several times (*see* phone records, Plf. Ex. 30, docket # 157-10) about the

medications, but the record does not reflect the identity of anyone that she spoke to.  The prescription

for plaintiff's psychiatric medications was not filled on Thursday, November 1, or Friday, November

2.  No medical staff was at the jail on Saturday or Sunday.

On Monday, November 5, defendant Garvey prepared an order for Dr. Rupert Blanco,

the SecureCare staff physician, for the two psychiatric medicines prescribed by Dr. Alt (Zyprexa and

Lithobid) and plaintiff's diabetes medication (Januvia), which had apparently not been verified by

anyone.  (Plf. Ex. 27, docket # 157-7).  Garvey testified that she had no recollection of what

prompted her to take this step.  (Garvey Dep. at 76-77).  Dr. Blanco signed the prescription order,

which was faxed to the Dunewood Pharmacy, the pharmacy regularly used by the jail medical staff.

(Plf. Ex. 28, docket # 157-8).  It was filled the same day, Monday, November 5.  According to CMH

records, Mr. Modd began taking the medications the next day, Tuesday, November 6.  (Plf. Ex. 31,

docket # 158-1).

Plaintiff appeared in court on November 6 on the probation charges.  Apparently,

Judge Bosman noted some bizarre behavior and requested follow-up.  Plaintiff was returned to the

jail.  He continued his bizarre behavior, at first refusing his medications.  A note from Deputy Wall

indicates that around 1:00 a.m., plaintiff activated his intercom and asked to be released.  He was

disoriented.  (docket # 158-3, ID# 1417).  Deputies took him to the medical unit, where his vital

signs were checked.  His blood sugar level was 196.  (docket # 134-3, ID# 950).  Nurse Wendy

Benson directed the officers to take plaintiff to the hospital if he got any worse. (docket # 158-3, ID# 1471).

On the morning of November 7, jail staff referred plaintiff to Matt Jachalke for a crisis assessment. Jachalke's report (Plf. Ex. 31, docket # 158-1, ID# 1407) noted that plaintiff was delusional and reported suicidal thoughts. He noted that plaintiff had resumed his medications the day before. He recommended hospitalization in the absence of improvement. (*Id.* at ID# 1410).

Plaintiff was taken to Holland Community Hospital on the evening of November 7 for purposes of a mental health examination, as ordered by Judge Bosman. He was seen there by CMH therapist Michael White, who prepared a Crisis Assessment Report. (Plf. Ex. 34, docket # 158-4). On the basis of findings concerning plaintiff's agitated mental state, White initiated proceedings for involuntary commitment. Plaintiff was hospitalized at the Gerber Hospital psychiatric unit from November 7 through 15, 2007. Plaintiff was then returned to the Ottawa County Jail. He ultimately entered a guilty plea to probation violation charges.

Plaintiff alleges that he is now insulin-dependent as a result of the six-day hiatus in receiving his diabetes medication while in the Ottawa County Jail. He further alleges a permanent deterioration of his psychological state resulting in the lack of psychotropic medications during the same time period. He contends that defendant Garvey was deliberately indifferent to his serious medical needs. He also contends that Ottawa County had an affirmative policy in favor of delaying medication to inmates, motivated by a desire to cut costs. Alternatively, his asserts that the delay in providing his medication was proximately caused by a failure of the County or SecureCare to adequately train their employees. Further facts relevant to these claims of deliberate indifference will be discussed in connection with the substantive analysis of plaintiff's claims.

## Applicable Standard

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a); *Kizer v. Shelby County Gov't*, 649 F.3d 462, 466 (6th Cir. 2011).  The standard for determining whether summary judgment is appropriate is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Pittman v. Cuyahoga County Dep't of Children & Family Services*, 640 F.3d 716, 723 (6th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).  The court must draw all justifiable inferences in favor of the party opposing the motion.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Gecewicz v. Henry Ford Macomb Hosp. Corp.*, 683 F.3d 316, 323 (6th Cir. 2012).

A party asserting that a fact cannot be genuinely disputed must support the assertion as specified in Rule 56(c)(1).  FED. R. CIV. P. 56(c)(1).  Once the movant shows that "there is an absence of evidence to support the nonmoving party's case," the nonmoving party has the burden of coming forward with evidence raising a triable issue of fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  To sustain this burden, the nonmoving party may not rest on the mere allegations of his pleadings.  FED. R. CIV. P. 56(e)(2), (3); *see Ellington v. City of East Cleveland*, No. 11-3700, ___ F.3d ___, 2012 WL 3156135, at * 2 (6th Cir. Aug. 6, 2012).  The motion for summary judgment forces the nonmoving party to present evidence sufficient to create a genuine issue of fact for trial.  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1990).  "A mere scintilla of evidence

is insufficient; 'there must be evidence on which a jury could reasonably find for the [non-movant].'" *Dominguez v. Correctional Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009) (quoting *Anderson*, 477 U.S. at 252); *see Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2012).

## Discussion

In the leading case of *Estelle v. Gamble*, 429 U.S. 97 (1976), the Supreme Court held that deliberate indifference to a prisoner's serious medical needs, manifested by prison staff's intentional interference with treatment or intentional denial or delay of access to medical care, amounts to the unnecessary and wanton infliction of pain forbidden by the Eighth Amendment. 429 U.S. at 104-05. With regard to pretrial detainees, the same rights are guaranteed under the same standards by the Due Process Clause of the Fourteenth Amendment. *See Bruederle v. Louisville Metro. Gov't*, No. 11-5637, ___ F.3d ___, 2012 WL 3000601, at * 4 (6th Cir. July 24, 2012); *Watkins v. City of Battle Creek*, 273 F.3d 682, 685-86 (6th Cir. 2001). Both the Eighth and the Fourteenth Amendments prohibit deliberate indifference to a prisoner's serious medical needs. *See Spears v. Ruth*, 589 F.3d 249, 254 (6th Cir. 2009).

The record discloses beyond genuine issue that plaintiff did not receive his psychotropic or diabetes medication from the time he arrived at the Ottawa County Jail (October 31) until November 6. The only disputes in this case concern the reason for the delay and whether it was caused by the deliberate indifference of any defendant. Plaintiff's complaint and brief criticize virtually every step of the process employed by the County and SecureCare to address plaintiff's medical needs. The detailed factual record amassed in this case, however, requires rejection of many of plaintiff's criticisms without detailed analysis.

-17-

- *Failure to Transport Medications From Muskegon County Jail*.  Plaintiff has presented no proof that any defendant is culpable for the failure of plaintiff's psychotropic medications to accompany him from the Muskegon County Jail.  The record is devoid of evidence concerning the person or persons responsible for that failure.  On the present record, it could be the fault of some employee of the Muskegon County Jail, plaintiff himself, or the transporting officer, Deputy VandenBosch, who has never been named as a party defendant.

- *Screening*.  No reasonable trier of fact could fault any defendant for a failure to assess and document plaintiff's medical needs in a prompt fashion.  A jail booking officer interviewed plaintiff within an hour of his arrival at the Ottawa County Jail and made appropriate records concerning both his medical conditions and his medications.  Two hours later, defendant Garvey performed an initial medical screening, again appropriately documenting plaintiff's conditions and his medications.  Given the lateness of the hour (after 10:00 p.m.), no rational trier of fact could fault Garvey, under any standard of conduct, for failing to verify plaintiff's medications instantly or for failure to retrieve his psychotropic medications from Muskegon County Jail.  (By plaintiff's own admission, he had run out of his diabetes medication by that time.)  Furthermore, Garvey documented the need to follow up on plaintiff's medications and placed his chart on the back table, in accordance with established SecureCare procedure.  Garvey clearly took reasonable steps[2] on the evening of

---

[2] It appears that Garvey should have, but did not, take the additional step of placing plaintiff's name on the "follow-up" list.  This, at most, was negligent.  There is no evidence that her failure to take the extra step had any impact on the events complained of.

October 31 to assure that medications would be verified by the next shift in the morning. Furthermore, Garvey properly noted plaintiff's need to check his blood sugar and for a diabetic diet and issued appropriate orders that night. No act or omission of Garvey on the evening of October 31, 2007, at the end of her shift, could be deemed actionable under any legal standard.

- *Verification Procedure for Psychotropic Medications*. By 10:00 a.m. the next morning (November 1), plaintiff was being interviewed by CMH social worker Matt Jachalke, pursuant to the standard policy implemented and followed by the County for prisoners with mental health needs. Jachalke appropriately documented plaintiff's condition and assisted in verifying his psychotropic medications. By approximately noon of the same day, plaintiff's psychiatrist, Dr. Nan Alt, had faxed a prescription to the jail. Plaintiff has presented no argument -- either factual or legal -- challenging the legitimacy of the verification requirement. In his deposition, plaintiff himself recognized the necessity for verifying medications coming into a correctional facility. (Modd Dep. at 44, docket # 154-3, ID# 1161). This understanding arose from his own experience as a corrections officer. (*Id.* at 77, ID# 1169). In short, the verification requirement was reasonable and the verification process -- with regard to plaintiff's psychotropic medications -- was executed expeditiously.

- *Lack of a Staff Psychiatrist*. Plaintiff makes much of the decision of the County not to accept SecureCare's proposal for an on-staff psychiatrist, in addition to the on-staff general medicine doctor. Neither the Supreme Court nor the Sixth Circuit has ever

held that a jail has a responsibility to contract to have *any* doctor regularly available to jail inmates, let alone a specialist.  More importantly for this case, however, is the fact that the lack of a staff psychiatrist was not the cause of any of the problems experienced by plaintiff.  Plaintiff had his own psychiatrist, Dr. Alt, who verified plaintiff's medications by noon of the day following his arrival at the jail.  The SecureCare staff were able to administer psychotropic medications and were contractually required to do so.  (Contract, Ex. A, ¶ 3.1(B), docket # 159-3, ID# 1471).  Plaintiff fails to explain how the County's decision not to have a part-time psychiatrist on call (who would only have been present eleven hours per week) would have resulted in any different treatment.  As the undisputed facts show, Dr. Blanco, the medical staff physician, was able to prescribe all of plaintiff's medications as soon as he was asked to do so.  The claim that plaintiff was somehow injured by the lack of a staff psychiatrist is a red herring.

The principal acts or omissions giving rise to a possible due process claim on this record are (1) the failure to fill Dr. Alt's prescription for psychiatric medications until Monday, November 5, and (2) the failure to verify plaintiff's need for the diabetes medication Januvia and failure to get a prescription for it until November 5.  The only remaining defendants that could be responsible for these failures are medical assistant Garvey, Ottawa County (and Sheriff Rosema in his official capacity), and SecureCare.

-20-

A.      **Defendant Garvey**

Karen Garvey was employed in October and November of 2007 as a medical assistant by SecureCare to perform certain clerical and patient-care functions at the Ottawa County Jail. She does not contest that this employment caused her to act under color of state law. *See West v. Atkins*, 487 U.S. 42 (1988); *Harrison v. Ash*, 539 F.3d 510, 521 (6th Cir. 2008) (nurse employed by prison health care contractor acts under color of law). In this capacity, she was constrained by the Due Process Clause not to display deliberate indifference to inmates' serious medical needs or to "intentionally" deny or delay access to medical care. *Estelle v. Gamble*, 429 U.S. at 104. Garvey is the only remaining defendant charged with individual culpability, in a personal capacity, in delivering plaintiff's medical care.

In *Wilson v. Seiter*, 501 U.S. 294 (1991), the Supreme Court established a two-step framework for determining whether certain conditions of confinement are actionable under Eighth Amendment standards. That framework consists of an objective and a subjective component. *Id.* at 298. To satisfy the objective component, plaintiff must be suffering from a serious medical condition. "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are serious." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). To satisfy the subjective component, a plaintiff must demonstrate that an individual defendant acted with a "sufficiently culpable state of mind in denying medical care." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir. 2004). Only "deliberate indifference" to serious medical needs will implicate the protections of the Eighth Amendment or, by analogy, the Due Process Clause. Deliberate indifference is characterized by "obduracy and wantonness." *Whitley v. Albers*, 475 U.S. 312, 319

(1986). It cannot be predicated on negligence, inadvertence, or good-faith error. *Id.*; *accord Daniels v. Williams*, 474 U.S. 327, 333 (1986) (due process guarantees of Fourteenth Amendment are not triggered by lack of due care by prison officials).

No one contests that plaintiff's bipolar disorder and diabetic condition both constitute "serious medical needs" as defined by the Supreme Court. Plaintiff contends that Garvey showed deliberate indifference to these medical needs "by numerous acts and omissions" (Brief at 28, docket # 154), but this accusation does not withstand scrutiny.

1.    Psychotropic Medications

Plaintiff blames Medical Assistant Karen Garvey for his failure to receive psychotropic medications until November 6, 2007. Garvey appears at only two points in the narrative -- she performed the initial health screening on the night of October 31, and she procured a prescription for plaintiff's medications from Dr. Blanco on November 5. The initial screening was done promptly, and Garvey appropriately documented plaintiff's condition, prescription medications, and the fact that he had left his psychotropic medications at the Muskegon County Jail. Plaintiff's brief nevertheless faults Garvey for failing to make any effort to retrieve plaintiff's medications from Muskegon County Jail.[3] In the circumstances, to have done so would have been commendable, even

---

[3] It is doubtful that Garvey's failure to retrieve plaintiff's medications from the Muskegon County Jail is even actionable under constitutional standards. The Constitution imposes a duty on prison officials to provide medical care because incarceration strips the inmates of virtually every means of self-protection and forecloses "their access to outside aid." *Farmer*, 511 U.S. at 833; *see Estelle*, 429 U.S. at 103 ("An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met."). This does not necessarily describe the situation of a pretrial detainee, at least not in Ottawa County. It is undisputed that jail policy allowed family members to bring in inmates' prescriptions. (Vink Dep. at 10, docket # 156-3, ID# 1329). In fact, this was "preferred," as it was quicker and cheaper. (*Id.*; Garvey Dep. at 28, docket # 155-9, ID# 1268). Plaintiff's wife therefore could have brought in his medications, but he never asked her

-22-

exemplary, given that it was almost 11:00 p.m. (the end of Garvey's shift) and Garvey was only a medical assistant tasked with performing an initial screening. In the circumstances, Garvey's failure to attempt to dispatch a deputy in the middle of Halloween night cannot be deemed even negligence, let alone "criminal recklessness," the Supreme Court's standard for deliberate indifference. *Farmer v. Brennan*, 511 U.S. 825, 839-40 (1994). A reasonable medical assistant could, consistent with her constitutional duties and the facts of this case, react to plaintiff's situation in one of a number of reasonable fashions. This includes taking the action that Garvey chose -- documenting the need for verification and leaving the medical chart on the rear table for the morning shift. Contrary to plaintiff's suggestion, Garvey testified unequivocally that she left the chart on the back table. (Garvey Dep., 58-59, docket # 159-9, ID# 1276). The testimony establishes without contradiction that this was the standard practice for items needing follow-up. No case cited by plaintiff remotely stands for the proposition that a medical assistant in Garvey's position acts with deliberate indifference by failing to dispatch a deputy to another county jail in the middle of the night, even assuming such an action was within her power.

Plaintiff's indictment of Garvey for failure to verify his medications is similarly devoid of substance. The failure to track down plaintiff's prescribing physician at 11:00 p.m. to verify medications cannot be deemed deliberate indifference. Furthermore, Garvey's failure to verify the psychotropic medications personally had no causal connection to any constitutional harm to plaintiff, as Dr. Alt verified the psychotropic medications by noon the next day, as a result of the

---

to do so. (Modd Dep. at 42-43, 134-36, docket # 154-3, ID#s 1160, 1183-84). Plaintiff was not without resources to procure his medications from Muskegon but apparently chose not to. It is not necessary to resolve this issue, however, as Garvey was clearly not deliberately indifferent by choosing another means to address plaintiff's medical situation.

efforts of SecureCare staff, Mr. Jachalke, or both.  Garvey did not even arrive back to work until her shift started at 2:30 p.m.; by this time, the psychotropic medications had been verified.  Ms. Garvey was not an Army of One; in fact, she was the most junior member of the SecureCare staff.  She was bound to avoid treating plaintiff's condition with deliberate indifference, not to provide all needed services personally.

The jail received Dr. Alt's prescription at 12:40 p.m. on November 1.  The record is devoid of evidence on which a jury could find that the failure to fill that prescription until November 5 was in any way attributable to the fault of Karen Garvey, let alone to her deliberate indifference. Without doubt, someone on the SecureCare staff should have filled the prescription and administered the medications to plaintiff.  The contract with the County required this.  But not a scintilla of evidence points to Garvey as the person who was responsible for doing so.  Plaintiff attempts to paper over this glaring gap in the proofs by arguing that "Karen Garvey and the Jail and Medical Staff" were indifferent (Brief at 27, docket # 154) or by asserting that "no one" followed up (*Id.* at 14).  Such arguments, unsupported by proof that Garvey *both* knew that the verified prescription had not yet been filled *and* failed to take any action are unavailing.  A defendant must "know of" and "disregard" an excessive risk to inmate safety in order to incur liability.  *Farmer*, 511 U.S. at 837.[4] In a section 1983 medical care case, the collective acts of the staff cannot be ascribed automatically to every defendant -- plaintiff must raise a triable constitutional claim against each defendant.  *See Reilly v. Vadlamudi*, 680 F.3d 617, 626 (6th Cir. 2012).

---

[4] During the time that he was without his medications, plaintiff sent several "kites" to the medical staff.  Garvey answered one (Plf. Ex. 26, docket # 157-6), but only on November 7.  There is no evidence that she was aware of the kite at any time before she responded to it, by which time plaintiff had received his medications.

After Garvey performed and documented plaintiff's initial screening on October 31, the next time that her name appears in the factual record is November 5, when she approached Dr. Blanco for prescriptions. This fact, in itself, undermines any conclusion that Garvey was deliberately interfering with plaintiff's medications -- she is the one who ultimately procured them. But the important point for summary judgment purposes is that no evidence -- whether direct or circumstantial -- indicates that Garvey knew that Dr. Alt's prescription had arrived, knew that the prescription had gone unfilled, or knew that plaintiff was not receiving his medication at any time before November 5. The best that plaintiff can muster is that Garvey (or some other, unnamed medical staffer) *should have known* and should have done something about it. This is sufficient for a medical malpractice case, but not for a section 1983 action. "We hold instead that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety. . . ." *Farmer*, 511 U.S. at 837. "It is not enough merely to find that a reasonable person would have known, or that defendant should have known. . . ." *Id.* at 843 n.8. The Sixth Circuit has recently cautioned that a negligent delay in delivering medications to an inmate does not meet constitutional standards. *Bruederle v. Louisville Metro. Gov't*, No. 11-5637, ___ F.3d ___, 2012 WL 3000601 at * 6 (6th Cir. July 24, 2012). A plaintiff must prove that the medical worker "knew that [plaintiff] required further medical attention" and then failed to provide it as a result of a culpable state of mind. *Id.* The issue is not whether Garvey knew of plaintiff's medical condition. Obviously, she did. The question is whether she knew his medical needs were not being adequately addressed and callously disregarded this fact. The holding in *Bruederle* makes this distinction clear. Plaintiff's evidence against Garvey falls far short of this standard.

2.    Diabetic Condition

Aside from the delay in recovering his psychotropic medications, plaintiff faults Garvey for deliberate indifference to his diabetic condition.  Plaintiff's first amended complaint flatly alleges that "Plaintiff's blood sugar was never tested and he was not provided a diabetic diet."  (Am. Compl. ¶ 30, docket # 24, ID# 148).  Discovery has shown this allegation to be false.  At the initial screening on October 31, Garvey accurately documented plaintiff's diabetic condition (docket # 155-6, ID#s 1236, 1238), completed a Diabetes Special Needs Treatment Plan (*Id.* at ID# 1237), ordered daily blood sugar monitoring (*Id.* at ID# 1238), sent an e-mail to corrections staff directing that plaintiff be allowed to check his blood sugar before breakfast for the next three days, then as needed (docket # 134, ID# 862), and wrote a note to the kitchen directing a diabetic diet (*Id.* at ID# 863).  Jail records show that plaintiff tested his blood sugar at 6:15 a.m. the next day and at least once a day thereafter.  (docket # 134-3, ID# 950; Garvey Dep. at 67-68, docket # 155-9, ID# 1278).

Hence, the only pleaded claims against Garvey in this regard -- failure to monitor plaintiff's blood sugar and failure to order a diabetic diet -- are demonstrably false.  In recognition of this, plaintiff moved (well after the close of discovery) for leave to file a second amended complaint, alleging for the first time that although plaintiff's blood sugar was "purportedly tested," it was never "monitored or accessed."  (Proposed Sec. Am. Compl. at ¶ 29, docket # 142-1).  The court denied plaintiff's attempt to inject this after-thought theory into the case so late in the proceedings.  (Orders, docket #s 176, 187).  Even if allowed to plead this theory, however, plaintiff has failed to support it with proof.  The record is devoid of any evidence that Garvey was aware of plaintiff's blood sugar readings or was in any way responsible for "monitoring or accessing" these records.  In fact, the testimony was that the staff nurses, not Garvey, were responsible for monitoring

-26-

the blood sugar tests. (Benson Dep. at 48-49, docket # 156-1, ID# 1309). In short, no reasonable trier of fact could conclude that Garvey was deliberately indifferent to plaintiff's need to monitor his blood sugar or to have a diabetic diet.

That leaves plaintiff's medication for diabetes. The only claim pleaded in any complaint -- filed or proposed -- is that plaintiff had his medication with him at the Muskegon County Jail, that he took his medication on the morning of October 31, that his medication was left in Muskegon, and that he did not receive it until November 6. (Am. Compl. ¶¶ 24-29). By plaintiff's own admission, most of these allegations are untrue as they relate to his diabetes medication. Plaintiff testified that his diabetes medication, Januvia, was not with the "Muskegon County meds" because he had run out of it before his arrest. (Modd Dep. at 133-34, docket # 154-3, ID# 1183). Hence, the only pleaded factual theory is unsustainable. Plaintiff's brief ignores the undisputed fact that plaintiff had run out of his Januvia, continuing to argue that Garvey should have somehow retrieved this nonexistent medication from the Muskegon County Jail.

Even if plaintiff had pleaded the facts now established by the record, he has not established a constitutional claim against Garvey with regard to his diabetes medication. Garvey accurately recorded plaintiff's condition and prescription medication. Once plaintiff's diabetic condition and prescription for Januvia were noted, it was the obligation of SecureCare personnel to verify the medication and somehow to address plaintiff's need for it. Garvey, for her part, thoroughly documented the situation at the end of her shift and left the medical chart for the next shift. Contrary to plaintiff's argument, it was not necessarily Garvey's obligation to verify this medication. Nurse Benson, the Clinical Administrator for SecureCare, testified as follows in response to questioning by plaintiff's counsel:

-27-

Q        And let's assume a situation where an inmate comes into the jail on a weekday evening and he is screened by a medical staff person who is there on second shift.  Obviously it would be difficult to verify medications with doctors' offices in the evening.

A        Correct.

Q        And so what was the procedure for either passing on that duty or following up on it?

A        Then that should be communication from that staff person to the staff person coming on in the morning at 7:00 for followup -- for the need for followup.

Q        And how would that be communicated?

A        Can be via leaving the chart -- the booking form and the chart in the nurse's station area and so that can all be followed up.

(Benson Dep. at 40-41, docket # 156-1, ID# 1307).  Benson refused to say that the initial screener remained "ultimately responsible" for this follow-up.  (*Id.*).  "So I think the team should follow up." (*Id.*).

        No reasonable juror, therefore, could find that Garvey was deliberately indifferent to plaintiff's need for diabetes medication.  Garvey followed the standard protocol for dealing with such matters at the end of one's shift.  Thus, it cannot even be said that she was negligent.  Even less could a jury find that Garvey was deliberately indifferent; that is, that she knew that plaintiff's Januvia had not been verified or prescribed but disregarded this fact.

        In short, plaintiff's constitutional claims against Garvey fail for lack of proof. Plaintiff's theory seems to be that Garvey, as the first medical staffer who contacted plaintiff, was thereafter personally responsible for ensuring follow-up on all his medical care.  Neither the facts of this case or the law governing deliberate indifference to serious medical needs support such a proposition.  The record is devoid of evidence that Garvey had any contact with plaintiff -- or any

-28-

knowledge or awareness of his condition -- between the evening of October 31 (when she screened

him) and November 5 (when she procured a prescription from Dr. Blanco).  No reasonable jury

could conclude that Garvey knew of and disregarded any health risk to plaintiff in the interim.

Garvey is entitled to a summary judgment.

     **B.**       **SecureCare**

       The record supports an inference that one or more of the medical staff employed by

SecureCare failed to fill Dr. Alt's prescription for psychotropic medications and failed to obtain a

prescription for plaintiff's diabetic medication until November 5, 2007, five days after plaintiff

arrived at the Ottawa County Jail.  There is no evidence that this neglect is attributable to defendant

Garvey (the only remaining SecureCare employee in this litigation) or, for that matter, any other

identifiable member of the SecureCare staff.  Nor is there any evidence of deliberate indifference or

wantonness on behalf of any SecureCare employee.  The best that can be said on the present record

is that the medical staff, or some member of the staff, was professionally negligent and failed to

exercise due care in the circumstances.

       Plaintiff nevertheless seeks to hold SecureCare liable under section 1983 for this five

or six-day delay in providing needed medical care.  If this were a medical malpractice action,

governed by state negligence law, plaintiff would have a case, as a corporate employer is responsible

for negligence of its employees on a *respondeat superior* theory.  In a federal civil rights action,

however, the law is otherwise.  With regard to both municipal and corporate employers, a plaintiff

cannot premise liability on the theory of *respondeat superior* or vicarious liability.  *Street v.*

*Correction Corp. of Am.*, 102 F.3d 810, 818 (6th Cir. 1996).  The Supreme Court fashioned this rule

in the context of municipal corporations.  *See Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978).

However, as the Sixth Circuit has noted, every federal appellate court to consider the issue has

extended the holding of *Monell* to private corporations as well, including corporations that provide

health care services in the prison context.  *Street*, 102 F.3d at 817-18; *accord Savoie v. Martin*, 673

F.3d 488, 493-94 (6th Cir. 2012).  Under these authorities, liability of a corporate employer may only

be found when its employees have acted pursuant to an official policy or custom.  *Monell*, 436 U.S.

at 694-95.  "[I]t is when execution of a government's policy or custom, whether made by its

lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the

injury that the government as an entity is responsible under section 1983."  *Id.* at 694.  To succeed

on such a claim, a plaintiff must establish that his constitutional rights were violated and that a policy

or custom of the municipality or corporation was the "moving force" behind the deprivation of

plaintiff's rights.  *Miller v. Sanilac County*, 606 F.3d 240, 254-55 (6th Cir. 2010).  Plaintiff cannot

succeed on this claim, on both legal and factual grounds.

### 1.    Corporate Liability in the Absence of an Underlying Constitutional Violation

By the time discovery closed, no employee of the County remained in this case as a

defendant in his individual capacity.  The only remaining employee of Secure Care is Karen Garvey,

who, as found above, did not commit a violation of plaintiff's constitutional rights.   This

circumstance raises the question whether a corporate employer may be held liable when plaintiff

cannot demonstrate a constitutional violation by any employee.  Perhaps anticipating this weakness

in his case, plaintiff argues strenuously (Brief at 31-36, docket # 154) that he is entitled to recover

against the corporate defendants even if he cannot prove that any individual was deliberately

indifferent to his medical needs.  Plaintiff relies on Sixth Circuit and out-of-circuit authority for this proposition.  Sixth Circuit law, however, is to the contrary.

The Supreme Court has clearly stated that the analysis of a claim of municipal liability must focus on "two different issues":  "(1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the City is responsible for that violation." *Collins v. Harker Heights*, 503 U.S. 115, 120 (1992).  Thus, when a city employee violates another's constitutional rights, "the city may be liable if it had a policy or custom of failing to train its employees and that failure to train caused the constitutional violation." *Id.* at 123.  The Court's rulings make it clear that in the absence of an underlying constitutional violation, a city cannot be held liable.  The clearest case embodying such a ruling is *City of Los Angeles v. Heller*, 475 U.S. 796 (1986).  In *Heller*, a jury found officers had not violated the plaintiff's rights in connection with an arrest.  On that basis, the trial court dismissed all claims against the city.  The Supreme Court affirmed, holding that if the police officers inflicted no constitutional injury, it was "inconceivable" that the city could be liable, regardless of what its policies were.  475 U.S. at 799.

The Sixth Circuit has construed *Heller* as requiring a finding that a municipal employee violated plaintiff's constitutional rights as a prerequisite to municipal liability.  The leading case in the Sixth Circuit is *Watkins v. City of Battle Creek*, 273 F.3d 682 (6th Cir. 2001), in which jail officials were accused of deliberate indifference to an inmate's need for medical attention.  The court of appeals affirmed the entry of a summary judgment for the defendant officers, because the evidence was insufficient to raise a triable issue of deliberate indifference.  Turning to the municipal defendants, the court held:

    Plaintiff argues that the City of Battle Creek and the Calhoun County Sheriff failed to properly train the individual defendants in violation § 1983. *If no constitutional violation by the individual defendants is established, the municipal defendants cannot be held liable under § 1983. City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).   Having found no constitutional violations could be established, the district court did not err in granting summary judgment to the municipal defendants.

273 F.3d at 687 (emphasis added).

    Also controlling is *Bowman v. Corrections Corp. of America*, 350 F.3d 537 (6th Cir. 2003).   In *Bowman*, the estate of a deceased prison inmate sued for inadequate medical treatment leading to the prisoner's death.   The jury found that neither the defendant warden nor the defendant doctor had been deliberately indifferent to the decedent's medical needs.   The district court, however, entered judgment against the corporate defendant (CCA, a provider of medical care to prisoners) on the basis of its allegedly unconstitutional policies.   The Sixth Circuit framed the issue as whether, in the absence of a constitutional violation of the decedent's rights by the warden or the doctor, CCA could be held liable for an allegedly unconstitutional policy.   350 F.3d at 545.   On the basis of the Supreme Court's decision in *City of Los Angeles v. Heller*, as well as its own precedent, the Sixth Circuit held that there must be an underlying violation of plaintiff's constitutional rights before a corporate defendant may be found liable.   *Id.* at 546.   The court declined to follow an Eighth Circuit decision that took a more narrow view of *Heller*.   *Id.*; *accord Hancock v. Dodson*, 958 F.2d 1367, 1376 (6th Cir. 1992) ("Because the only city police officer present committed no constitutional violation, the city cannot be held liable. . . ."); *May v. Franklin County Comm'rs.*, 437 F.3d 579, 586 (6th Cir. 2006) (where a plaintiff fails to show that any individual violated his rights, "there can be no § 1983 liability on the part of [the municipality] for failure to train as a matter of law.").

Plaintiff relies on two subsequent Sixth Circuit decisions, but he seriously misapprehends their import.  In *Gray v. City of Detroit*, 399 F.3d 612 (6th Cir. 2005), the district court found that the individual defendants were entitled to qualified immunity in a jail suicide case. The lower court dismissed the claims against the municipality, because "'if no constitutional violation by the individual defendants is established, the municipal defendants cannot be held liable under § 1983.'"  399 F.3d at 617.  The Court of Appeals remarked that it was "arguable" that the district court erred.  The court pointed out that a state actor can be entitled to qualified immunity even when the officer violates plaintiff's rights.  *Id.*  When the law is not clearly established, an officer is entitled to immunity "even if those agents in fact had invaded the plaintiff's constitutional rights."  *Id.* (quoting *Scott v. Clay County, Tenn.*, 205 F.3d 867, 879 (6th Cir. 2000)).  On this basis, the *Gray* court assumed "for the sake of argument" that circuit law allows a municipality to be held liable in the absence of any employee's committing a constitutional violation.  *Id.* at 617.  The court went on to find that the city's failure to train its employees was not actionable.  *Id.* at 617-19.

Properly understood, the *Gray* decision does not support plaintiff's position, for two reasons.  First, the court's statements about municipal liability are clearly *dictum* and were not intended to enunciate a rule of law or to overrule circuit precedent.  An appellate court does not endorse a principle of law by calling it "arguable," nor does it establish that principle by assuming its validity "for sake of argument."  *See* 399 F.3d at 617.  Beyond the court's clear indication that it was only assuming the principle's validity for sake of argument, these remarks were *dictum* because they were not necessary to the result -- the court found no municipal liability in any event. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 66-67 (1996) (contrasting holdings with *dictum*; which is a statement not necessary to the result).  Second, and more important, if *Gray* established

-33-

any principle of law in this regard, that principle is that the municipal defendant can be liable even when the individual defendants are qualifiedly immune.  This is perfectly consistent with the rule of *Heller* and *Bowman*, which require an underlying violation of constitutional rights by some employee.  In the hypothetical *Gray* situation, that employee's immunity does not necessarily mean that the employee did not commit a constitutional violation -- he is merely afforded immunity for that violation because the law was not clearly established at the time he acted.  Such a principle remains unsettled in the Sixth Circuit to this day, as the court continues to absolve municipal employers of liability, especially in failure-to-train cases, where its officers have been granted qualified immunity.  *See Hagans v. Franklin Cnty. Sheriff's Office*, No. 11-3648, ___ F.3d ___, slip op. at 9 (6th Cir. Aug. 23, 2012) ("But 'a municipal policy maker cannot exhibit fault rising to the level of *deliberate* indifference to a constitutional right when that right has not yet been clearly established.'") (quoting *Szabla v. City of Brooklyn Park*, 486 F.3d 385, 393 (8th Cir. 2007) (*en banc*).

Thus, plaintiff's reliance on *Gray* is seriously misplaced.  This is not a situation where plaintiff has shown that Karen Garvey, or any other SecureCare employee, violated his constitutional rights, but the court has granted the individual immunity on the basis of the lack of clarity in the law in 2007.  Rather, plaintiff has failed to show that *any* employee of SecureCare violated his constitutional rights, that is, that anyone acted with deliberate indifference.

Plaintiff's extensive reliance on *Ford v. Grand Traverse County*, 535 F.3d 483 (6th Cir. 2008), is mendacious.  The court in *Ford* did indeed uphold a jury verdict against the municipality, even though the jury found that no jail official acted with deliberate indifference.  What plaintiff omits is that the panel found that the municipality had failed to preserve the argument that

municipal liability must be premised on an individual employee's liability.  535 F.3d at 490-94.  On

that basis, the panel declined to address the argument's merits.  *Id.* at 491.  *Ford* articulated no

principle helpful to plaintiff in the present case.

Beyond Sixth Circuit authority, plaintiff presents an incomplete discussion of out-of-

circuit law, focusing only on favorable cases.  The truth is that the circuits are split.  The Seventh

Circuit is particularly aggressive in reading the Supreme Court's decision in *Heller* very narrowly.

*See, e.g., Thomas v. Cook County Sheriff's Dep't*, 604 F.3d 293, 304 (7th Cir. 2009).  This contrasts

with the Sixth Circuit's treatment of *Heller* in *Watkins* and *Bowman*, in which the court read *Heller*

as holding municipal liability is "inconceivable" if no officer inflicted a constitutional injury.  350

F.3d at 545.  Other circuits side with the Sixth Circuit.  The D.C. Circuit, for example, holds that a

finding of municipal liability in an Eighth Amendment medical care case requires a two-step inquiry.

First, the court must determine whether plaintiff has stated a "predicate claim of deliberate

indifference by prison officials to [plaintiff's] serious medical needs."  *Baker v. District of

Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003).  Under the second prong, the court should

determine whether plaintiff has established "that a policy or custom of [the municipality] caused the

constitutional violation *alleged under the first prong*."  *Id.* (emphasis added).  The Sixth Circuit

applies the same two-part test.  *See, e.g., Lee v. Metro. Gov't of Nashville & Davidson County*, 432

F. App'x 435, 449 (6th Cir. 2011).  Under this authority, municipal liability depends on a finding

that someone was deliberately indifferent and that municipal policy caused that constitutional

violation.

Plaintiff would like to try his case against the corporate defendants without having

to show that any particular employee was deliberately indifferent to his serious medical needs.

-35-

Plaintiff's argument is that the "underlying" constitutional violation is the six-day delay experienced by plaintiff in receiving medication.  A prisoner's delay in receiving medication is not, standing alone, a violation of the Constitution.  The Constitution does not impose an affirmative obligation to afford all desired medical care.  It requires only that prison officials not display deliberate indifference to serious medical needs.  A delay in providing medications may be, depending on the facts, innocent, negligent, deliberately indifferent, or malicious and intentional.  In the first two circumstances, no constitutional violation occurs; in the latter two circumstances, the denial of medical care reaches constitutional proportions.  This is all a long way of saying that the finding of a constitutional violation requires not only an objective component but also a "subjective" component of at least deliberate indifference, a component that plaintiff would rather dispense with in this case.  Relieving plaintiffs of the obligation to show a culpable state of mind by any human being would certainly change the face of section 1983 litigation in this circuit.  Unfortunately for plaintiff, such a result contravenes settled authority, which requires a showing *both* of individual indifference *and* that the municipality's policies were the motivating force behind that violation. *See, e.g., City of Canton v. Harris*, 489 U.S. 378, 391 (1989) ("Thus in the case at hand respondent must still prove that the deficiency in training actually caused the police officers' indifference to his medical needs.").  On this basis, the Sixth Circuit has repeatedly held that municipal defendants cannot be held liable if no constitutional violation by its employees has been established.  *See, e.g., Meier v. County of Presque Isle*, 376 F. App'x 524, 530-31 (6th Cir. 2010); *Denning ex rel. Denning v. Metro. Gov't of Nashville*, 330 F. App'x 500, 506 (6th Cir. 2009); *Estate of Harbin v. City of Detroit*, 147 F. App'x 566, 572-73 (6th Cir. 2005); *Napier v. Madison County, Ky.*, 238 F.3d 739, 743 (6th Cir. 2001).  Like the D.C. Circuit, the Sixth Circuit considers the issues of individual

liability and municipal liability to be "inextricably linked." *Cooper v. County of Washtenaw*, 222 F. App'x 459, 473 (6th Cir. 2007).

On the basis of these authorities, I conclude that plaintiff cannot recover against SecureCare "as a matter of law," because he has failed to show that any employee was deliberately indifferent to his medical needs. *See Weeks v. Portage County Exec. Offices*, 235 F.3d 275, 279 (6th Cir. 2000).

### 2. Existence of Corporate Custom or Policy Causing Plaintiff's Injury

Even if the court assumes, for sake of argument, that a corporate employer can be held responsible under section 1983 even if none of its employees has been deliberately indifferent, this is not the case for imposition of such liability. To succeed on a claim of municipal or corporate liability under section 1983, a plaintiff must establish that his constitutional rights were violated and that a policy or custom of the corporation was the "moving force" behind the deprivation of plaintiff's rights. *Miller v. Sanilac County*, 606 F.3d 240, 254-55 (6th Cir. 2010). A plaintiff may establish liability under *Monell* in several ways. First, liability may be premised on the existence of an express policy adopted by the appropriate authorities. *See Adkins v. Bd. of Educ. of Magoffin County, Ky.*, 982 F.2d 952, 957 (6th Cir. 1993). In the absence of a formally adopted policy, liability may be premised on the existence of a custom. For purposes of *Monell*, a custom must be "so permanent and well settled as to constitute custom or usage with the force of law." *Monell*, 436 U.S. at 691. It must reflect a course of action deliberately chosen from among various alternatives. *See City of Oklahoma v. Tuttle*, 471 U.S. 808, 823 (1985). Alternatively, liability may be premised by a corporation's failures, namely, a failure to institute a policy or the failure to train its employees.

Liability on this theory only exists where the need to act "is so obvious, the inadequacy is so likely to result in the violation of constitutional rights, that the policy makers of the [corporation] can reasonably be said to have been deliberately indifferent to the need." *City of Canton v. Harris*, 489 U.S. 378, 390 (1989) (failure to train); *see Heyerman v. County of Calhoun*, 680 F.3d 642, 648 (6th Cir. 2012) (failure to adopt policy and failure to train).

Plaintiff's amended complaint identifies no specific policy, custom, or failure by SecureCare that allegedly motivated a constitutional deprivation in this case. In opposing summary judgment, plaintiff has argued that SecureCare should be held liable for its failure to train its employees and for the lack of a policy that would have prevented plaintiff's injuries. (Brief at 36-39, docket # 154). This assertion does not withstand scrutiny.

To state a claim under a theory of "inaction," the plaintiff must establish:

(1)     The existence of a clear and persistent pattern of constitutional violation by employees;

(2)     Notice or constructive notice on the part of the corporation;

(3)     The corporation's tacit approval of the unconstitutional conduct, such that its deliberate indifference in failing to act can be said to amount to an official policy of inaction; and

(4)     That the failure to act was the "moving force" or direct causal link in the constitutional deprivation.

*See City of Canton*, 489 U.S. at 388-89 (failure to train); *Doe v. Claiborne County, Tenn.*, 103 F.3d 495, 508 (6th Cir. 1996) (failure to act); *Soles v. Ingham County*, 316 F. Supp. 2d 536, 544-45 (W.D. Mich. 2004), *aff'd*, 148 F. App'x 418 (6th Cir. 2005).

Plaintiff's case founders on virtually every aspect of the relevant test. A plaintiff's initial burden is to identify the policy and connect it to a constitutional injury. *See Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1994). Plaintiff cannot identify any deficiency in his care that was directly caused by SecureCare's failure to train its employees or failure to have a more specific policy. With regard to the administration of plaintiff's psychotropic medications, plaintiff dwells at length on the contradictory testimony given by SecureCare employees concerning responsibility for *verifying* the prisoner's psychotropic medications. (Brief at 8-12, docket # 154). A fair reading of the record, in a light most favorable to plaintiff, shows that there was indeed confusion and contradiction in the understanding of SecureCare employees concerning who had the obligation to verify a prisoner's psychotropic medications. Plaintiff, however, suffered no constitutional violation in this regard. The undisputed facts disclose that plaintiff's psychotropic medications were indeed verified promptly. The prison received a prescription from Dr. Alt at 12:40 p.m., approximately eighteen hours after plaintiff's arrival at the Ottawa County Jail. Therefore, plaintiff's ability to show some confusion concerning responsibility for verifying psychotropic medications in general is unavailing in the present case. Plaintiff's psychotropic medications were indeed verified by SecureCare staff (or Mr. Jachalke coordinating with SecureCare staff) in a timely fashion.

As noted several times in this report and recommendation, the problem in plaintiff's case was not verifying his psychotropic medications, but getting the prescription filled. There was no ambiguity in SecureCare policies on this score. SecureCare's contract required it to distribute all medications to the inmate population, "including psychotropic medications." (Contract, Ex. A

-39-

¶ 3.1B, docket # 159-3, ID# 1471).  Nor did the witness testimony disclose any confusion by SecureCare employees concerning their obligation to administer medications, once prescribed.

With regard to plaintiff's diabetes medication, the problem was different. Although the psychotropic medications were promptly verified, the diabetes medication was not.  Plaintiff's long presentation concerning confusion about verifying psychotropic medications is irrelevant to this issue, as SecureCare staff clearly had the responsibility to both verify and administer the diabetes medication.  SecureCare's written policies accept this obligation, and the testimony of its employees showed no confusion concerning this responsibility.  The problem was that no one undertook to execute this responsibility for a period of six days.  A corporate employer is not automatically liable under section 1983 if one of its employees happens to apply a valid policy in an unconstitutional manner. *City of Canton*, 489 U.S. at 387.  "The occasional negligent administration of an otherwise sound policy is not sufficient to impose municipal liability."  *Heyerman*, 680 F.3d at 648.

Even if plaintiff were able to identify a deficiency in SecureCare's procedures in verifying and administering medications, SecureCare would not be liable under section 1983 unless those deficiencies were "clear and persistent," such that the company was on actual or constructive notice of the problem.  The Sixth Circuit has called this the "obviousness" test. *See Gray*, 399 F.3d at 617 (quoting *City of Canton*, 489 U.S. at 390).  A municipality may be liable under section 1983 only where the need for more or different training (or a different policy) is so obvious, and the inadequacy is so likely to result in the violation of constitutional rights, that the corporate employer can reasonably be said to have been deliberately indifferent to the need.  *City of Canton*, 489 U.S. at 390.  This is an objective standard. *Farmer v. Brennan*, 511 U.S. at 841.

-40-

Plaintiff has not established that problems in the verification or delivery of medications at the Ottawa County Jail were so obvious that SecureCare can be deemed deliberately indifferent for ignoring them. The principal way of establishing this necessary element of a section 1983 case is for a plaintiff to show a history of similar incidents of which the employer was or should have been aware, such that its failure to take ameliorative action can be deemed deliberate. *See, e.g., Miller v. Calhoun County*, 408 F.3d 803, 816 (6th Cir. 2005). The deposition testimony shows no such history. The only proof that plaintiff has offered are medical records from seven other county prisoners (Plf. Ex. 44-50, docket #s 159-6 through 159-10), which plaintiff argues establish a pattern of delay in providing psychotropic medications. This sketchy proof fails to establish that SecureCare should have been aware of an obvious problem in the delivery of medications in October and November of 2007, when plaintiff was in the Ottawa County Jail, for two reasons. First, only three of these other prisoners (Witness 1, Witness 2, and Witness 3) were booked into the Ottawa County Jail before October 31, 2007. Witness 1 was booked in August of 2005, Witness 2 in January of 2006, and Witness 3 in March of 2007. A single problem with delivery of medications per year in a jail population of this magnitude can hardly be deemed a "clear and persistent pattern." *Doe*, 103 F.3d at 508. SecureCare could not possibly have been on actual or constructive notice in November of 2007 of the other incidents, which happened only after Mr. Modd's incarceration. Second, even the three previous incidents do not show any consistent pattern of failure. The records from Witness 1 (Plf. Ex. 44, docket # 159-6) show an apparent delay in verifying the inmate's psychotropic medications (which was not the problem in Mr. Modd's case) followed by a prescription for medications different from those prescribed by the inmate's personal physician (also not a problem in Mr. Modd's case). The records for Witness 2 disclose a long delay in screening a

-41-

patient by CMH.  Mr. Jachalke's note of February 22, 2006, takes responsibility for the "gap in CMH services."  Again, this was not a problem in Mr. Modd's case.  He was seen by a CMH representative the day after his admission.  The records for Witness 3 show a delay in verifying medicines in March 2007.  (Plf. Ex. 47, docket # 159-9).  The medical record shows an initial three-day delay while the inmate's medicines were retrieved from Grand Rapids, without further explanation.  No reasonable trier of fact could conclude that these three incidents, spread over a three-year period, show a "clear and persistent pattern" or that SecureCare was put on notice of a training deficiency to which it was thereafter deliberately indifferent.

The Supreme Court has recently cautioned that a municipality's culpability for a deprivation of rights "is at its most tenuous where a claim turns on a failure to train."  *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011).  The Court remarked that the deliberate indifference standard applicable to such claims "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."  Thus, "a pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train."  *Id.*

Plaintiff's proofs fall far short of this stringent standard.  Although plaintiff has unearthed three previous incidents, they are not similar to his nor would they have put a reasonable employer on objective notice of an obvious problem in the verification and delivery of medications.  Although the delay in delivering plaintiff's medications to him was unfortunate and probably negligent, the record does not disclose the reason for the delay, nor does it show that the delay was due to any individual's deliberate indifference.  Much less does the record show a clear and consistent pattern of this sort of problem, such that it should have been obvious to SecureCare.

-42-

"Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have chosen a training program that will cause violations of constitutional rights." *Connick*, 131 S. Ct. at 1360.  SecureCare is entitled to summary judgment on plaintiff's claims.

### C.    Ottawa County and Sheriff Rosema

Plaintiff seeks to hold Ottawa County and Sheriff Rosema, in his official capacity, liable for the delay in receipt of his medications.  The claims against the County are governed by the *Monell* standards discussed at length in section B above.  The claims against the Sheriff in his official capacity are governed by the same standards.  To the extent that a suit is against a county sheriff in his official capacity, it is tantamount to a suit against the county itself.  *See Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1244-45 (6th Cir. 1989); *accord Baar v. Jefferson County Bd. of Educ.*, Nos. 10-5704, 10-5741, 2012 WL 738741, at * 13 (6th Cir. Mar. 7, 2012).  Thus, in an official-capacity action, a plaintiff must show that the governmental entity's policy or custom was the moving force behind the deprivation.  *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).  The liability of the County and the Sheriff can therefore be analyzed together.

Plaintiff's claim against the County is insubstantial.  I note at the outset that the record discloses no act or omission by any jail employee that contributed to plaintiff's failure to receive his medications.  Upon arrival at the jail, plaintiff was screened by the booking officer, who made an accurate record of plaintiff's medications and referred him instantly to the medical staff.  Thereafter, there is no indication that any jail official interfered with plaintiff's care.  All of the County defendants have been dismissed from this case.  Thus, under the *Heller* decision, as applied

repeatedly by the Sixth Circuit, the lack of evidence of an underlying constitutional violation requires dismissal of the claims against the County as well.

Beyond that, plaintiff has failed to identify any specific County policy that led to a violation of plaintiff's rights. Plaintiff argues that the County is liable on the basis of its lack of policies and procedures governing the administration of psychotropic medications to inmates at the jail. (Brief at 39-43, docket # 154). Plaintiff rejects the County's argument that his claim is based on an "inaction" theory and thereby dismisses out of hand cases on which defendant relies. (Brief at 39). Plaintiff makes a distinction without a difference. Section 1983 claims against municipalities based on a failure to train, the lack of a policy, or other inaction are all governed by the same standards, as established by the Supreme Court in *City of Canton v. Harris*, 489 U.S. 378, 388-89 (1989). In all such cases, plaintiff must show that the need for a policy (or further training) is so obvious that the municipality's conscious decision not to act can be said to amount to a policy of deliberate indifference. *City of Canton*, 489 U.S. at 389; *Heyerman*, 680 F.3d at 648 (applying *City of Canton* to a claim based on the lack of a policy).

Plaintiff's argument is that County policies left an obvious gap in the care of inmates with psychiatric needs. This accusation is simply contrary to the evidence. The County contracted with SecureCare for comprehensive coverage of the jail's inmates. Its contract with SecureCare provided that SecureCare would verify "medications with outside physicians or agencies for those inmates who are booked into the facility with active prescriptions." (Contract, Ex. B, ¶ 3.1(B)(1), docket # 159-3, ID# 1441). This provision does not exclude psychotropic medications. The contract also required SecureCare to monitor "distribution of medications to the inmate population, including psychotropic medications." (*Id.* ¶ 3.1(B)(2)). No "obvious" gap exists. Furthermore, the County

-44-

had CMH regularly present at the jail.  Although CMH physicians would only treat indigent patients, presumably non-indigent patients had access to their own physicians.  There is no evidence that the County interfered with an inmate's ability to access his own physician.  The CMH social workers were available for patients with serious needs, even if the CMH physicians were not.  Having gone to the cost and effort to erect this on-site medical presence, which would ostensibly cover the verification and dispensing of all medications, including psychotropics, the County did more than the Constitution required.  In the absence of notice of a persistent pattern of failure in the policies it adopted, the County cannot be deemed deliberately indifferent.

In many respects, plaintiff's claims against Ottawa County mirror those asserted against Washtenaw County in *Graham v. County of Washtenaw*, 358 F.3d 377 (6th Cir. 2004). *Graham*, like the present case, involved a Michigan county that had entered into a comprehensive contract with SecureCare for the provision of medical care to county prisoners.  The personal representative of the decedent sued the county for the death of a jail inmate who, plaintiff asserted, was the victim of a gross mistake by one of SecureCare's nurses.  The essence of the municipal liability claim, as distilled by the Sixth Circuit, was that the county's contract with SecureCare constituted a municipal policy that led to a deprivation of the decedent's constitutional right to adequate medical care.  358 F.3d at 380.  The Sixth Circuit rejected the claim of municipal liability, not because the decedent's constitutional rights had not been abridged, but because no county policy was "the moving force" behind the violation.  *Id.* at 383.  The court remarked that it is "not unconstitutional for municipalities to hire independent medical professionals to provide on-site health care to prisoners in their jails."  *Id.* at 384.  The court found such a policy to be laudable, as it allows prisoners to receive prompt health care from on-site medical personnel rather than

corrections officers.  Plaintiff's argument in *Graham* was identical to that advanced by the same attorneys in the present case:  "Graham's argument is essentially that the County's policy did not, in this particular case, adequately address Mr. Graham's specific medical needs."  *Id.*  The court conceded that the policy might be flawed, but that such a flaw did not rise to constitutional magnitude.  "The fact that alternative procedures might have better addressed [a prisoner's] particular needs does not show that the [county was] deliberately indifferent to his medical needs."  *Id.*  The court pointed out that, consistent with the Supreme Court's decision in *City of Canton*, there can be no municipal liability "where 'an otherwise sound program has occasionally been negligently administered.'"  *Id.* (quoting *City of Canton*, 389 U.S. at 391).

For this reason, the Court of Appeals affirmed a summary judgment on behalf of the county.  The court's comments in *Graham* apply with equal force to the present case.

> In sum, the County instituted its policy regarding the provision of medical care to prisoners undoubtedly in an effort to improve the quality of their medical care.  Even if Mr. Graham received constitutionally inadequate medical care, there is simply no evidence that the policy was the "moving force" behind that constitutional violation. *Waters*, 242 F.3d at 362.  Under the circumstances presented in this case, the section 1983 claim against the County was properly dismissed.

358 F.3d at 385.[5]

The glaring hole in plaintiff's case against the County is that there is no evidence of an obvious problem in the delivery of medications to psychiatric patients that would have put the County on notice of an alleged gap in its policies.  It is easy, after a tragedy occurs, to see a gap in hindsight.  This is plainly insufficient to establish a municipality's liability.  *See Starcher v. Corr.*

---

[5] Although plaintiff's brief cites the *Graham* case in passing, it fails to note the controlling effect of this authority.  This lack of candor is hard to understand, as plaintiff's attorneys were counsel of record in *Graham*.

-46-

*Med. Sys., Inc.*, 7 F. App'x 459, 466-67 (6th Cir. 2001).  The record lacks proof of any clear and

persistent pattern of problems regarding psychotropic medications, such that the county knew or

should have known of an obvious need for a different medical policy and thereafter ignored it.

Deliberate indifference in the municipal context "does not mean a collection of sloppy, or even

reckless, oversights; it means evidence showing an obvious, deliberate indifference to" a particular

problem.  *Doe*, 103 F.3d at 508.  No rational jury could find in favor of plaintiff and against the

County on this standard.

### Recommended Disposition

For the foregoing reasons, I recommend that defendants' motions for summary

judgment (docket #s 131, 133) be granted and that final judgment be entered in their favor and

against plaintiff.


Dated:   August 24, 2012                         /s/  Joseph G. Scoville
                                                 United States Magistrate Judge

### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within
fourteen days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All
objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b).  Failure to file
timely and specific objections may constitute a waiver of any further right of appeal.  *See Thomas
v. Arn*, 474 U.S. 140 (1985); *United States v. Branch*, 537 F.3d 582, 587 (6th Cir.), *cert. denied*, 129
S. Ct. 752 (2008); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).  General
objections do not suffice.  *Spencer v. Bouchard*, 449 F.3d 721, 724-25 (6th Cir. 2006); *see Frontier*,
454 F.3d at 596-97; *McClanahan v. Comm'r of Social Security*, 474 F.3d 830, 837 (6th Cir. 2006).